# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

**JOHN ALLEN STEWART, JR., # 301161**                                    **PLAINTIFF**

**VERSUS**                                   **CIVIL ACTION NO.: 1:07-cv-1172-LG-JMR**

**HARRISON COUNTY SHERIFF'S DEPARTMENT,**
**GEORGE PAYNE, JR., HEALTH ASSURANCE LLC,**
**AND DR. UNKNOWN COMPTON**                                   **DEFENDANTS**

---

## REPORT AND RECOMMENDATION
---

This matter is before the Court pursuant to a Motion [62-1] for Summary Judgment by Health

Assurance, LLC ("Health Assurance") which was Joined [66-1] by the Harrison County Sheriff's

Department ("Sheriff's Department) and Sheriff George Payne, Jr. ("Payne"). Health Assurance's

Motion was accompanied by a Memorandum [63-1] in Support. Additionally, the Sheriff's

Department and Payne filed a separate Motion [64-1] for Summary Judgment and Motion [67-1] for

Qualified Immunity which were accompanied by Memoranda [65-1; 68-1] in Support. Health

Assurance filed Joinders [69-1; 70-1] to both the Motion [64-1] for Summary Judgment and Motion

[67-1] for Qualified Immunity. Harrison County filed a Joinder [70-1] to Health Assurance's Motion

[62-1] for Summary Judgment as well as a Joinder [71-1] to the Sheriff Department and Payne's

Motion [64-1] for Summary Judgment and Motion [67-1] for Qualified Immunity. Plaintiff John

Allen Stewart ("Stewart") filed a Response [73-1] in Opposition to Health Assurance's Motion for

Summary Judgment, to which Defendants filed Rebuttals [74-1; 76-1; 82-1]. The Court being fully

advised in the premises, and after carefully considering the pleadings filed as a matter of record, along

with the applicable law, finds that the Defendants' Motions for Summary Judgment and Qualified

Immunity should be granted. Accordingly, Stewart's Complaint in the above-captioned action should

be dismissed.

## STATEMENT OF THE CASE

On November 1, 2007, Plaintiff Stewart filed this *pro se* § 1983 Complaint on behalf of his deceased wife, Cheryl Lynn Smith Stewart ("Cheryl"), alleging that Payne, Harrison County, and Health Assurance exhibited deliberate indifference to her serious medical needs in violation of the Eighth Amendment.[1] Specifically, Stewart alleged that Defendants' deliberate indifference caused or contributed to the Cheryl's death from metastatic breast cancer after her release as a pretrial detainee at the Harrison County Adult Detention Center ("HCADC"). On September 08, 2008, Plaintiff amended his Complaint to substitute the Fourteenth Amendment rather than the Eighth Amendment as the source of Cheryl's rights.[2]

## FACTS:

The Court has constructed Cheryl's medical history from her initial diagnosis of breast cancer in 2002 until her death in 2005 so that Cheryl's treatment within the HCADC can be viewed in the context of her entire treatment for cancer.

## Cheryl's Medical History Prior to Incarceration

Cheryl underwent a biopsy of her right breast in 1976. (Exhibit 2 , pg. 20, attached to Motion [62-3]). She underwent a needle aspiration in her left breast in 1992. *Id.*

On July 17, 2000, Cheryl underwent a mammogram at Memorial Hospital Gulfport ("Memorial"). Radiologist Dr. Raymond Tipton noted areas of suspicious calcification in both breasts, and recommended a biopsy. *Id.* at 2.

---

[1] Stewart's claims stem from two arrests; the first which began on December 23, 2004, and the second which began on August 28, 2005. *See* Complaint.

[2] The constitutional rights of a convicted prisoner are protected by the Eighth Amendment prohibition against cruel and unusual punishment, while a pretrial detainee's flow from the due process guarantees of the Fourteenth Amendment. *See Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996).

On October 10, 2001, a second mammogram was performed by Dr. Charles Gruich which showed further suspicious calcifications which were "highly suggestive of malignancy." *Id*. at 4-5. Dr. Gruich stated that Cheryl apparently was aware of the suspicious findings revealed by her July 2000 mammogram, but chose not to seek medical attention at that time. Dr. Gruich strongly recommended that Cheryl submit to a biopsy. *Id.*

Dr. Gruich referred Cheryl to see Dr. Hopkins on November 8, 2001, but Cheryl did not show for the appointment. (Exhibit 3, pg. 31, attached to Motion [62-6]). Dr. Hopkins rescheduled Cheryl's appointment for November 23, 2001, but Cheryl again failed to show. *Id.* at 32. Cheryl's examination was again rescheduled for January 2, 2002, and she kept the appointment. *Id.* at 33-40. Cheryl consented to biopsies of both breasts. *Id*. at 40.

On February 6, 2002, Cheryl's biopsy revealed a cancerous carcinoma in her left breast. (Exhibit 2, pgs. 18-19, 22-23, attached to Motion [62-3]). On February 7, 2002, Dr. Hopkins informed Cheryl that her cancer posed the threat of spreading, and discussed her treatment options which included either a partial mastectomy followed by irradiation or a complete mastectomy of the entire breast. Dr. Hopkins noted that either procedure would likely require the removal of the auxiliary lymph nodes in her armpit. (Exhibit 3, pg. 42, attached to Motion [62-6]).

On March 11, 2002, Dr. Hopkins admitted Cheryl to Memorial for a complete mastectomy of her left breast and placement of an Infuse-A-Port for the purposes of chemotherapy. The final pathology revealed metastasis of the cancer to one direct inguinal lymph node. (Exhibit 2, pgs. 72 -73, 78-82, 103, attached to Motion [62-3]).

Dr. Hopkins referred Cheryl to Dr. P.V. Pande with the Medical Oncology Group for consultation and evaluation. (Exhibit 3, pg. 21, attached to Motion [62-6]). On April 2, 2002, Dr. Pande scheduled Cheryl for adjuvant chemotherapy in order to reduce Cheryl's risk of redeveloping

cancer. Id. at 21-22; (Exhibit 10, pgs. 1-2, attached to Motion [62-14]). On April 17, 2002, Dr. Pande met with Cheryl to enroll her on a protocol to receive chemo-immunotherapy in order to both kill residual cancer cells as well as strengthen her immune system to fight cancer. Dr. Pande thoroughly discussed the protocol with Cheryl and provided her with consent documents to review, sign and return before enrollment in the protocol. *Id.* at 3-4.

On May 22, 2002, Cheryl cancelled her appointment with Dr. Hopkins. On that same date, Cheryl did not show for her appointment with Dr. Pande. The records do not indicate that Cheryl ever again saw Dr. Hopkins or Dr. Pande for adjuvant chemotherapy. *Id.* at 13; (Exhibit 3, pg. 67, attached to Motion [62-6]).

On December 7, 2004, Cheryl was treated at Memorial for a lump in the left side of her neck. The x-ray did not reveal any evidence of metastatic cancer. Cheryl was provided with antibiotics and told to follow up with Dr. Hopkins later that week. Further, Cheryl was instructed to call Memorial on December 8, 2004, for evaluation and biopsy. (Exhibit 2, pg. 157, attached to Motion [62-4]). The records do not indicate that Cheryl ever contacted Dr. Hopkins for followup or returned to Memorial for evaluation and biopsy.

On the evening of December 23, 2004, Cheryl was arrested by an officer with Long Beach Police Department. Cheryl complained of a painful neck mass, and she was transported by ambulance to the emergency room at Memorial on December 24, 2004. Hospital personnel noted that Cheryl had previously been examined for the mass in her neck, but that Cheryl had not followed up as instructed. The hospital employee noted that "[Cheryl] thinks she should be admitted to hospital for biopsy." A Memorial physician scheduled Cheryl for a follow up in one week, and noted that she needed evaluation of the neck mass for biopsy by a general surgeon. Cheryl was released into the custody of the Long Beach police. (Exhibit 2, pgs. 163-68, attached to Motion [62-4]).

## Cheryl's Medical History During First Incarceration: Dec., 2004 - Feb., 2005

On December 24, 2004, Cheryl was transported from Memorial to the HCADC.  Cheryl informed a Health Assurance nurse about her previous diagnosis of breast cancer, her subsequent mastectomy, the lump in her neck, and her prescribed medications.  However, Cheryl did not tell the nurse that she was scheduled for a biopsy of her neck mass.  Cheryl was placed on a list to see a doctor on December 29, 2004.  (Exhibit 4, pgs. 4, 25 attached to Motion [62-7]).

On December 26, 2004, Cheryl completed a request form to see a doctor about a persistent fever and a swollen lymph node in her neck.   However, she did not mention that she had missed a biopsy of the lump in her neck. *Id.* at 3.

On December 29, 2004, Dr. Compton examined Cheryl at HCADC and concluded that she would need treatment by an oncologist. Dr. Compton prescribed medication and scheduled a follow-up appointment in one week.  Dr. Compton's treatment notes do not indicate that Cheryl mentioned that her incarceration caused her to miss a scheduled biopsy.  *Id.* at 21, 29.

On January 6, 2005, Cheryl was again seen by Dr. Compton at the HCADC.  Dr. Compton ordered labs and a chest x-ray, prescribed medication, and scheduled a follow-up appointment in one week, and ordered a referral to general surgery for a lymph node biopsy.  *Id.*

On January 6, 2005, Cheryl also submitted two requests for medical care.  On a Health Assurance request form, Cheryl asked to be examined for her cancer and for swollen lymph nodes in her neck.  The form was received on January 9, 2005, and Cheryl was placed on the list to see the doctor on January 13, 2005. *Id.* at 5. Cheryl submitted another request to Captain Taylor on an Inmate Request Form and said she needed a biopsy on her neck mass.   The form was received on January 24, 2005, and sent to the medical department on January 27, 2005. *Id.* at 6.  Cheryl did not report in either form that she had missed a previously scheduled biopsy.

On January 10, 2005, a medical history was obtained from Cheryl and a physical examination was conducted.   Cheryl told the examiner about the swollen lymph node in her neck, but did not mention that she had missed a biopsy due to her incarceration.  The examiner noted that Cheryl was scheduled to see an outside surgeon.  *Id.* at 9-12.

On January 12, 2005, Cheryl made another written request to Captain Taylor asking about her appointment for a biopsy.  The request was received on January 18, 2005, and was forwarded to Nurse Parker.  *Id.* at 16.

 On January 17, 2005, Dr. Compton saw Cheryl for a follow-up examination, ordered another chest x-ray,  and referred her to general surgery for a left lymph node biopsy.  *Id.* at 21, 29.

Cheryl was scheduled for a surgical consultation with Dr. Sproles on January 19, 2005.  At the time, Cheryl was awaiting a court appearance at the HCADC courtroom, and she indicated to the officers that she preferred attending the court appearance rather than the surgical consultation.  However, a Health Assurance nurse persuaded Cheryl to keep her appointment with Dr. Sproles.  *Id.* at 16-17, 26.

At the surgical consultation, Cheryl relayed her medical history to Dr. Sproles.  Cheryl advised him that she had been diagnosed with breast cancer in 2001 and underwent a complete left mastectomy.   She further advised him that she had refused Dr. Pande's recommendation for chemotherapy.  Dr. Sproles examined Cheryl's left lymph node and recommended both a biopsy and CT scan of her chest and abdomen.  *Id.* at 30.

On January 20, 2005, a single chest x-ray was taken which indicated a subtle area of increased density in the left upper lob.  Additional films were taken which revealed new areas of increased density.  A CT scan was recommended.  *Id.* at 41-42.

On January 24, 2005, Dr. Compton ordered a follow-up visit for Cheryl.  On January 25, 2005,

Nurse Parker notified Cheryl that she had been scheduled for a biopsy the next week. *Id.* at16.

On January 27, 2005, Memorial medical personnel performed a CT scan of Cheryl's chest, abdomen and pelvis, and Dr. Sproles performed a biopsy on Cheryl's left lymph node of the neck. (Exhibit 2, pgs. 169-237, attached to Motion [62-5]). Following the procedures, Cheryl was discharged and returned to the HCADC.

The results of the CT scan of Cheryl's chest showed the following: multiple pulmonary nodules in the right lung adenopathy, marked lymphadenopathy including a large confluent soft tissue mass in the prevascular space measuring approximately 5.1cm., periclavicular adenopathy, densities in the left lung, and possible bone invasion in the sternum. The CT of Cheryl's abdomen and pelvis revealed multiple liver lesions and a lesion in the second lumbar vertebral body. *Id*. at 208-209. The chest x-ray showed worsening of left basilar infiltrate, possible left pleural effusion. *Id*. at 210. The initial pathology report and the amended pathology report sent to Dr. Sproles on January 28, 2005, and February 2, 2005, respectively, revealed metastatic breast cancer. *Id.* at 200-01; (Exhibit 4, pgs. 57-58, attached to Motion [62-7]). On January 31, 2005, and February 3, 2005, Dr. Sproles sent Dr. Compton notice that Cheryl was suffering from metastatic cancer. (Exhibit 4, pgs. 54-55, attached to Motion [62-7]). In summary, the examinations revealed multiple areas of metastasis including bilateral lesions in the lungs, chest, multiple lesions in the liver, and lesions in the sternum and spine.

Cheryl returned to the HCADC on January 27, 2005, and Dr. Compton promptly ordered that she be admitted to the medical department, prescribed Tylenol for pain, and provided her with a social worker. *Id*. at 27, 32. On January 28, 2005, Cheryl advised her social worker that she was scared about her diagnosis, and she was prescribed Prozac and scheduled for a follow-up with a psychiatrist. *Id.* at 22-23, 32. On January 31, 2005, Dr. Compton ordered that Cheryl be scheduled to see Dr. Pande for chemotherapy as soon as possible. *Id.* at 32.

Cheryl was released from the HCADC on February 11, 2005. (Exhibit 9, pgs. 29-32, 64, attached to Motion [62-13]).

**Cheryl's Medical History from Release until Second Incarceration: Feb., 2005 - Aug., 2005**

Following her release from the HCADC, Cheryl was briefly imprisoned at the Baldwin County Corrections Center in Alabama on February 11, 2005. During her incarceration, Cheryl received no treatment for her cancer. She was released from custody on February 18, 2005. (Exhibit 14, pgs. 1-16, attached to Motion [62-18]).

On March 8, 2005, Cheryl went to the emergency room of the South Baldwin Regional Medical Center in Foley, Alabama complaining of weakness, nausea, fever and pain in her left shoulder and neck. An x-ray revealed lesions suggestive of adenopathy and she was schedule to see Dr. Patel on March 11, 2005. (Exhibit 5, pgs. 5-15, attached to Motion [62-9]).

On March 11, 2005, Cheryl was examined by Dr. Patel with Hematology Oncology Associates. Dr. Patel noted that Cheryl had been previously diagnosed with breast cancer in March 2002, and that she was currently suffering from metastatic breast cancer. (Exhibit 6, pgs. 1-2, attached to Motion [62-10]). Dr. Patel also noted that he had discussed Cheryl's condition with her and that she understood that it was incurable. He recommended chemotherapy in order to slow the progression of the disease, but noted that Cheryl was without insurance to pay for the procedures. He stated that Cheryl was scheduled to see him again the following week to let him know of her decision. *Id.* at 2.

On March 31, 2005, Cheryl contacted Dr. Patel for a prescription of pain medicine. On April 8, 2005, she visited Dr. Patel and he noted that Cheryl had thus far been unable to secure financing for her chemotherapy treatments. *Id.* at 4. Dr. Patel noted that Cheryl was trying to secure disability payments or Alacaid for her treatments, and recommended that Cheryl return to see him the following

week. *Id.* The medical records indicate that Cheryl did not return to Dr. Patel's care until November, 2005. *Id.* at 5.

On May 18, 2005, Cheryl was examined in the Oncology Department of the University of Mississippi Medical Center ("UMC") by Dr. Ralph Vance. Dr. Vance diagnosed Cheryl as suffering from metastatic breast cancer, and ordered CT and bone scans in order to determine the extent of metastasis. (Exhibit 7, pgs. 3-7, attached to Motion [62-11]). The June 1, 2005, bone scan indicated metastasis to the rib cage, femurs and spine. The CT scan of the abdomen and pelvis showed lesions in the upper chest, lungs, and liver. *Id.* at 10-12. On June 8, 2005, Dr. Thigpen in UMC's Oncology Department ordered an MRI of Cheryl's brain which revealed lesions in both hemispheres consistent with metastatic breast cancer. *Id.* at 21.

On June 21, 2005, Cheryl saw Dr. Daniel Patterson with Singing River Hospital. Dr. Patterson noted that Cheryl declined chemotherapy following her mastectomy in 2002. Dr. Patterson stated that he planned to draft a treatment protocol for Cheryl's illness, and that hormonal treatments or chemotherapy could possibly be administered. (Exhibit 8, pg 10, attached to Motion [62-12]). A June 23, 2005, CT scan indicated the presence of lesions in Cheryl's lungs, bones, and liver consistent with metastasis. *Id.* at 21-22. Dr. Patterson arranged to have Cheryl fitted with a port insertion for receiving chemotherapy. *Id.* at 36-37. Cheryl was scheduled for six cycles of chemotherapy, with each cycle consisting of chemotherapy once a week for six weeks. Cheryl would then rest for two weeks between each six-week cycle. *Id.* at 42.

Cheryl began her chemotherapy cycle on Monday, July 18, 2005. She received her next three treatments on Monday, July 25, 2005; Thursday, August 4, 2005; and Thursday, August 11, 2005. However, Cheryl did not receive treatment between August 14 and August 20, 2005. Dr. Patterson called Cheryl when she did not appear for her therapy on August 23, 2005, and she resumed her

treatment on Thursday, August 25, 2005. *Id.* at 33-35. On August 26, 2005, Dr. Patterson's nurse practitioner told Stewart that it was important for Cheryl to receive her treatments as prescribed and the nurse made an appointment for Cheryl on August 30, 2005, to discuss treatment issues. *Id.* at 33.

### Cheryl's Medical History During Second Incarceration: August, 2005 - September, 2005

On August 26, 2005, Cheryl was arrested in Mississippi on a Florida warrant and was taken to the HCADC. During booking, she informed the medical department that she had metastatic cancer. (Exhibit 4, pgs. 68, 73, 75, attached to Motion [62-8]); (Exhibit 9, pgs. 34-37, attached to Motion [62-13]).

On August 29, 2005, Hurricane Katrina struck the Gulf Coast. On August 31, 2005, Dr. Compton ordered that Cheryl's medical records be obtained as soon as possible due to the hurricane. (Exhibit 4, pg. 76, attached to Motion [62-8]). On September 12, 2005, Dr. Compton saw Cheryl at the HCADC. He prescribed medication and scheduled a follow-up appointment in a week. He also asked to expedite Cheryl's transfer to Florida due to her metastatic breast cancer. *Id.* at 74-76. On September 15, 2005, Cheryl's medical records were requested from Dr. Patterson. *Id.* at 78. On September 16, 2005, the sheriff in Escambia County, Florida informed the Harrison County Sheriff that Florida would not extradite Cheryl, and she was released from custody of the HCADC on that date. *Id.* at 81; (Exhibit 9, pgs. 37-38, 66, attached to Motion [62-13]).

### Cheryl's Post-Release Medical History

On September 20, 2005, Cheryl notified Dr. Patterson's office that she would be unable to make her chemotherapy appointment. (Exhibit 8, pg. 33, attached to Motion [62-12]). Cheryl contacted Dr. Patterson on September 21, 2005, and complained of a mass near her sternum and weakness in her right arm. An MRI of Cheryl's brain and neck revealed numerous enlarged masses within both sides of the brain and likely metastasis in the lymph nodes along her neck. *Id.* at 79-80.

On September 21, 2005, Cheryl began her second six-week cycle of chemotherapy. *Id.* at 35, 72-73.

On September 23, 2005, Dr. Patterson was informed that Cheryl was at the South Baldwin Hospital in Foley, Alabama, and that she could not move her right side. *Id.* at 34. On September 27, 2005, Dr. Patterson examined Cheryl and scheduled her for radiation treatment on September 28, 2005, by Dr. Patel. *Id.* at 84-85.

On October 3, 2005, Cheryl went to Gulf Coast Cancer Center in Foley and saw Dr. Hixson. Dr. Hixson examined Cheryl and noted that she suffered from advanced metastatic breast cancer with bony involvement in the brain, spine, and sternum. (Exhibit 6, pgs. 41-42, attached to Motion [62-10]).

Cheryl began radiation at South Baldwin Regional Medical Center on October 4, 2005. (Exhibit 5, pgs. 16-21, attached to Motion [62-9]). On October 12, 2005, Cheryl saw Dr. Hixson for a follow up visit. *Id.* at 22-25.

On November 4, 2005, Cheryl was evaluated by Dr. Patel with Hematology Oncology Associates. Dr. Patel revised Cheryl's chemotherapy protocol in light of her radiation treatments. (Exhibit 6, pg. 5, attached to Motion [62-10]). On November 16, 2005, Dr. Hixson saw Cheryl for a follow up visit and told her to return in four weeks. Dr. Hixson noted that Cheryl had acquired MRSA, but that she showed no evidence of infection. *Id.* at 49-50.

On December 2, 2005, Dr. Patel met with Cheryl and her brother and reviewed her current condition. Dr. Patel noted that Cheryl was showing signs of edema, and he placed her on a diuretic. Dr. Patel also scheduled Cheryl for an MRI of her brain in four weeks. *Id.* at 9.

On December 19, 2005, Cheryl died of breast cancer. (Exhibit 12 attached to Motion [62-16]).

**<u>STANDARD OF REVIEW</u>**:

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). "The mere existence of a factual dispute does not by itself preclude the granting of summary judgment." *St. Amant v. Benoit*, 806 F.2d 1294, 1296-97 (5th Cir. 1987). "The requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). In other words, "[o]nly disputes over the facts that might effect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Furthermore, it is well settled in this circuit that "[b]are bones allegations are insufficient to withstand summary judgment because the opposing party must counter factual allegations by the moving party with specific, factual disputes; mere general allegations are not a sufficient response.'" *Howard v. City of Greenwood*, 783 F.2d 1311, 1315 (5th Cir. 1986) (*quoting Nicholas Acoustics Specialty Co. v. H & M Constr. Co.*, 695 F.2d 839, 845 (5th Cir. 1983)).

In considering a motion for summary judgment, the trial court views the evidence in the light most favorable to the party resisting the motion. *See Howard v. City of Greenwood*, 783 F.2d 1311, 1315 (5th Cir. 1986). To survive summary judgment, the non-movant must demonstrate the existence of a disputed issue of material fact. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). To avoid the entry of summary judgment, the non-moving party must bring forth significant probative evidence demonstrating the existence of a triable issue of fact. *See Howard*, 783 F.2d at 1315.

42 U.S.C. § 1983 imposes liability upon any person who, acting under the color of state law, deprives another of federally protected rights. Therefore, section 1983 affords a remedy to those who

suffer, as a result of state action, deprivation of rights, privileges, or immunities secured by the Constitution and the Laws of the United States. *White v. Thomas*, 660 F. 2d 680,693 (5th Cir. 1981). A plaintiff cannot succeed merely by showing any deprivation of his rights. Section 1983 was intended to protect rights protected by federal law. *Karmi-Panahi v. Los Angles Police Dept.*, 839 F. 2d 621 (9th Cir. 1988); *Wright v. Collins*, 766 F.2d 841 (5th Cir. 1985).

## ANALYSIS:

In their Motions for Summary Judgment [62-1; 64-1], Defendants contend that Stewart's official capacity claims against them are, in reality, claims against Harrison County. Thus, Stewart must demonstrate that his claims are actionable under the United States Supreme Court's jurisprudence regarding municipal liability under section 1983. Additionally, in their Motion for Qualified Immunity [67-1], Defendants argue that Stewart's individual capacity claims must fail because he has failed to establish that a violation of Cheryl's Constitutional rights occurred, or that Defendants' conduct was objectively unreasonable at any time.

Under 42 U.S.C. § 1983, liability may be imposed upon any person who, acting under the color of state law, deprives another of federally protected rights. It neither provides a general remedy for the alleged tort of state officials, nor opens the federal courthouse doors to relieve complaints of all who suffer injury at the hands of the state or its officers. Municipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose "moving force" is the policy or custom. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001); *Monell v. Dep't of Soc. Services*, 436 U.S. 658, 694 (1978). *Monell* and later decisions reject municipal liability predicated on *respondeat superior*, because the text of section 1983 will not bear such reading. *Board of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997). "Congress did not intend municipalities to be held liable unless action pursuant to official

municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691.

A suit against a governmental agent or officer in his official capacity is a suit against the office that the employee holds and not against the actual employee. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985). The three requirements for municipal liability outlined in *Piotrowski* are necessary in order to distinguish between individual violations by local employees and those that can be fairly attributed to conduct by the governmental entity itself. *See Piotrowski*, 237 F.3d at 578-79. The United States Supreme Court has clearly emphasized the necessity of an official policy as a predicate to recovery under a theory of municipal liability:

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell*, 436 U.S. at 695. Therefore, municipalities may not be held liable for acts of lower level employees, but may be held liable for constitutional violations committed pursuant to an official policy or custom. *Piotrowski*, 237 F.3d at 578.

In addition, not only must the plaintiff establish that a policy or custom of the municipality was the "moving force" behind the alleged violation of a constitutional right; he must also establish that the municipality was "deliberately indifferent" to the known consequences of the policy. *Id.* at 580; *See Lawson v. Dallas County*, 286 F.3d 257, 264 (5th Cir. 2002) ("[T]he municipality must maintain its official policy with deliberate indifference to a constitutionally protected right."). Deliberate indifference is an objective standard which encompasses "not only what the policymaker actually knew but what he should have known, given the facts and circumstances surrounding the official policy and its impact on the plaintiff's rights." *Lawson*, 286 F.3d at 264. The Fifth Circuit has noted that the plaintiff bears an "extremely heavy burden" in establishing both the municipality's

deliberate indifference and a causal link between the alleged custom and the alleged constitutional violation. *Peters v. City of Biloxi*, 57 F.Supp. 2d 366, 376 (S.D. Miss. 1999). *See Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998); *Piotrowski*, 237 F.3d at 580 (Stating that these two requirements "must not be diluted").

Stewart asserts both official and individual capacity claims against the Defendants. Furthermore, Stewart's claims cover two periods of incarceration. To avoid confusion, the Court will first address Stewart's official capacity claims during both periods of incarceration, and then address Stewart's individual capacity claims during the same periods.

## I. Stewart's Official Capacity Claims:

Stewart claims that Defendants are liable under section 1983 by and through their employment with the Harrison County Sheriff's Department. However, the Court notes that Stewart's official capacity claims against the defendants are, in reality, a claim against the Harrison County Sheriff [3], and, ultimately, Harrison County. Therefore, to the extent Stewart brings this action against Defendants in their official capacity, he must establish a constitutional violation, and in addition must satisfy the three requirements necessary to impose municipal liability: first, that Harrison County had an official policy, practice or custom which would subject it to section 1983 liability; second, that the official policy is linked to the constitutional violation(s); and third, that the official policy reflects Harrison County's deliberate indifference to that injury. *See Lawson*, 286 F.3d at 263.

Stewart alleges that Defendants are liable in their official capacities for exhibiting deliberate indifference to Cheryl's serious medical needs while she was incarcerated as a pretrial detainee at the HCADC. Specifically, Stewart contends that Defendants prevented her from attending a scheduled

---

[3] The Harrison County Sheriff's Department is not separate and distinct legal entity. See *Darby v. Pasadena Police Dept.*, 939 F.2d 311 (5th Cir. 1991); *Miller v. Choctaw County Sheriff Dept.*, 2006 WL 662340, *2 (N.D. Miss. 2006).

biopsy, and later interrupted or interfered with her chemotherapy treatments. However, other than the above mentioned allegations of inadequate medical care, Stewart presents no evidence that an official policy of the Harrison County Sheriff existed which violated his constitutional rights. The Court finds that such bare allegations, without more, are simply insufficient to support a claim that there existed a policy or custom which was the moving force behind any alleged constitutional violation. At best, Stewart's assertion amounts to an isolated incident of negligent conduct, which, by itself, is insufficient to support the instant official capacity claims against Defendants.

In addition to establishing the existence of an official policy, Stewart must establish that the official policy is linked to the violation of a constitutional right. Stewart alleges that Defendants violated Cheryl's Fourteenth Amendment Due Process rights by preventing her from receiving the necessary medical care for her cancer. When an alleged constitutional violation for failure to provide adequate medical care stems from an episodic act or omission, the question is whether the state official acted with deliberate indifference to the individual's constitutional rights. *See Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001).

In order to prove deliberate indifference to serious medical needs, and thus a constitutional violation, a prisoner must show that the state official knew of and disregarded an excessive risk to inmate health or safety. *See Stewart v. Murphy*, 174 F.3d 530, 534-35 (5th Cir. 1999). The standard is the same for a pretrial detainee alleging an episodic act or omission rather than a condition of confinement. *Hare v. City of Corinth*, 74 F.3d 633, 650 (5th Cir. 1996). Deliberate indifference is more than mere negligence in providing or failing to provide medical treatment. *See Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993); *Williams v. Treen*, 671 F.2d 892, 901 (5th Cir. 1982). Disagreement with medical treatment alone is insufficient to support a claim under section 1983. *See Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997). Further, the law is clear that unsuccessful

medical treatment, mere negligence, neglect, nor medical malpractice gives rise to a section 1983 cause of action. *See Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991). If a dispute exists as to whether appropriate medical treatment was given, exceptional circumstances must exist for the claim to be actionable pursuant to section 1983. *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995). Additionally, medical records or medication, diagnosis, and sick calls may rebut an inmate's allegation of deliberate indifference. *Id.*

Cheryl was taken into custody of the Long Beach Police Department on December 23, 2004, and was transported to Memorial the following morning for a medical evaluation regarding the mass in her neck. Cheryl was scheduled for an evaluation of the neck mass for biopsy to take place the following week, and then released into custody of the Long Beach Police Department.

On December 24, 2004, Cheryl was transported to the HCADC. The medical forms which Cheryl filled out upon entry into the HCADC recited her medical history, but did not mention that she was scheduled for a biopsy the following week. On December 26, 2004, Cheryl complained of neck pain and fever and requested to see a doctor. However, Cheryl did not mention that she was scheduled to have an evaluation of the neck mass for possible biopsy.

On December 29, 2004, Cheryl was examined by Dr. Compton at the HCADC. Dr. Compton concluded that Cheryl was in need of examination by an oncologist, prescribed her medication, and scheduled her for a followup examination the next week. Again, Cheryl did not mention that she had missed a scheduled biopsy due to her incarceration.

Cheryl submitted two written requests for medical care on January 6, 2005, and January 9, 2005. Neither report indicated that she had missed a scheduled biopsy of the mass in her neck. On January 6, 2005, Dr. Compton examined Cheryl, ordered labs and chest x-rays, prescribed pain medication, and ordered a referral to general surgery for a lymph node biopsy. The following day,

the labs were performed and the referral was faxed over to Dr. Sproles.

On January 12, 2005, Cheryl filed another written medical request to inquire about her biopsy appointment. On January 17, 2005, Dr. Compton saw Cheryl for a followup examination. On January 19, 2005, Cheryl was scheduled for a surgical consultation with Dr. Sproles. On January 20, 2005, Dr. Sproles performed a x-ray of Cheryl's chest and scheduled her for a CT scan.

On January 24, 2005, Dr. Compton conducted another followup examination. On January 27, 2005, Cheryl was admitted to Memorial for a CT scan and lymph node biopsy. On January 28, 2005, the results of the various tests indicated that Cheryl was suffering from metastatic breast cancer in her bones, liver and lungs. Upon return to the HCADC, Cheryl was examined by Dr. Compton, prescribed pain and anxiety medication, and scheduled to see an oncologist for chemotherapy. On February 11, 2005, Cheryl was released from the HCADC.

The gravamen of Stewart's allegations surrounding Cheryl's initial incarceration is that Defendants knowingly interrupted or interfered with Cheryl's previously scheduled biopsy. However, the Court finds that the overwhelming weight of the evidence is to the contrary. There is simply no indication that Defendants were aware that Cheryl was scheduled for a biopsy of the neck mass prior to her incarceration. No medical records note that Cheryl reported missing a biopsy. Perhaps more telling, Cheryl's own medical requests fail to mention that she had missed a previously scheduled biopsy of her neck. The Court finds that, absent some indication that Defendants were aware that Cheryl had missed a biopsy, there is no evidence tending to establish that Defendants subjectively disregarded a serious or excessive risk to Cheryl's health.

Assuming, *arguendo*, that Defendants were aware that Cheryl was scheduled for a biopsy, the medical records corresponding to Cheryl's first incarceration within the HCADC clearly rebut Stewart's allegations that Defendants were deliberately indifferent to her serious medical needs.

Cheryl was examined on numerous occasions by Dr. Compton, prescribed pain medication and evaluated by the diagnostic procedures which were available. Furthermore, once Dr. Compton realized that Cheryl was in need of a more thorough evaluation, she was promptly referred to Dr. Sproles for biopsy and CT scans. Finally, following her diagnosis, Cheryl was immediately examined by Dr. Compton and referred to an oncologist for chemotherapy assessment. The records indicate that Cheryl was released from the HCADC within two weeks of being diagnosed with cancer.

Stewart's Complaint additionally alleges that Defendants exhibited deliberate indifference toward Cheryl by interrupting her chemotherapy. However, there is no indication that Defendants responded with deliberate indifference to Cheryl's medical needs during her second incarceration, as the medical records clearly demonstrate that Defendants were aware of her medical condition and timely took appropriate action.

On August 26, 2005, Cheryl was arrested on a Florida warrant and returned to custody of the HCADC. Upon arrival, Cheryl notified the medical department that she suffered from breast cancer and metastatic disease. On August, 29, 2005, Hurricane Katrina devastated the Gulf Coast. On August 31, 2005, Dr. Compton ordered that Cheryl's medical records be obtained as soon as possible.

On September 12, 2005, Dr. Compton examined Cheryl at the HCADC. He prescribed pain medication and scheduled her for a followup appointment in a week. Furthermore, Dr. Compton inquired if it were possible to expedite Cheryl's transfer to Florida because of her health conditions. On September 15, 2005, Cheryl's medical records were requested from her oncologist, Dr. Patterson. The following day, Florida authorities informed the Harrison County Sheriff that Florida would not extradite Cheryl, and she was released from the HCADC after only seventeen days of incarceration.

The Court finds that Stewart's allegations against the Defendants do not rise to the level of

deliberate indifference to Cheryl's serious medical needs. Initially, it appears that Defendants were unaware of the seriousness of Cheryl's medical condition. Furthermore, after the extent of her metastatic disease became apparent, the record clearly reflects that Defendants responded with the appropriate level of urgency and care.

Based upon the evidence of record, the Court concludes that Stewart has failed to establish a violation of Cheryl's constitutional rights. Stewart's complaints regarding Cheryl's medical treatment, at best, constitutes a disagreement with the treatment received and, at worst, sounds in medical malpractice. Regardless, neither allegation is sufficient to state a constitutional claim under section 1983. *See Norton,* 122 F.3d at 292; *Vanardo*, 920 F.2d at 321. The law is clear that unsuccessful medical treatment, mere negligence, neglect, nor medical malpractice gives rise to a section 1983 cause of action. *Vanardo*, 920 F.2d at 321. This issue is without merit.

Assuming, *arguendo*, that Cheryl's constitutional rights were violated, the Court further finds that Stewart has failed to create a genuine issue as to the existence of causation between the Defendants' allegedly unconstitutional acts and Cheryl's death from breast cancer. The Fifth Circuit has held that, "[a] plaintiff seeking to recover on a wrongful death claim under § 1983 must prove both the alleged constitutional deprivation required by § 1983 and the causal link between the defendant's unconstitutional acts or omissions and the death of the victim, as required by the state's wrongful death statute." *Phillips v. Monroe County, Miss*., 311 F.3d 369, 374 (5th Cir. 2002). Thus, a wrongful death plaintiff must not only establish the violation of a constitutional right in order to state a section 1983 claim, but also meet the additional burden of proving causation between the conduct and the death.

Stewart contends that Defendants caused or contributed to Cheryl's death because her initial incarceration delayed a lymph node biopsy and her second incarceration interfered with her

chemotherapy treatments.   However, Stewart has failed to designate a medical expert to testify as to the impact of the delay in Cheryl's diagnosis or treatment.   Further, Stewart has failed to produce any medical records or medical evidence tending to support his position that the Defendants' conduct caused or even contributed to her death.

The Court finds that, when viewed in juxtaposition with Cheryl's entire record of treatment, the delays caused by Cheryl's incarceration are not sufficient to create a genuine issue as to the cause of Cheryl's death from breast cancer.   Cheryl was diagnosed with breast cancer in 2002, and underwent a complete mastectomy.  Cancer cells were discovered in one of Cheryl's inguinal lymph nodes, and the node had to be removed as well. Cheryl's oncologist, Dr. Pande, notified her that she needed chemoimmunotherapy and scheduled her for treatments. However, Cheryl disregarded the recommendation of her oncologist and elected to forgo chemotherapy treatment.   A gap in the medical record chain indicates that Cheryl did not see a physician regarding her breast cancer treatment between May 22, 2002, and  December 7, 2004.

On December 7, 2004, Cheryl reported to the Memorial emergency room for an examination of a lump in her neck.  Cheryl was directed to call the following day and schedule a biopsy.  However, the medical records before the Court indicate that Cheryl never followed up on her biopsy appointment.   Cheryl did not again visit Memorial until after she was arrested on December 23, 2004. Memorial personnel again recommended that Cheryl schedule an appointment for biopsy the following week, but the available records indicate that Cheryl did not report this to anyone at the HCADC. Consequently, Cheryl did not undergo a biopsy until January 27, 2005.

Following her diagnosis of metastatic breast cancer, Cheryl was scheduled to receive six cycles of chemotherapy once a week for six weeks.  Her first cycle began on July 18, 2005.   The medical records indicate that Cheryl missed both her Week Five and Week Six chemotherapy treatments for

undisclosed reasons.   She resumed her fifth treatment on August 23, 2005.  The following day corresponds with Cheryl's second arrest and incarceration with the HCADC, and she missed her sixth treatment which had been scheduled for August 30, 2005.   Cheryl was released from the HCADC on September 16, 2005.  As per her treatment protocol, Cheryl was scheduled for a two week rest period following her Week Six chemotherapy treatment,  and thus missed only one scheduled treatment due to incarceration.

The Court finds that Stewart has failed to create a genuine issue as to whether the Defendants' conduct was the cause of Cheryl's death, as the record is replete with evidence of Cheryl's neglect concerning her physical condition.  Medical records indicate that Cheryl disregarded her oncologist's recommendation for chemotherapy despite being advised that her cancer posed the threat of metastasis.  Additionally, Cheryl was urged to schedule a biopsy of the mass in her neck on December 8, 2004.  However, when Cheryl was arrested on December 23, 2008, she had yet to make an appointment for evaluation and biopsy.   Finally, there is no indication that Cheryl informed anyone at the HCADC of her previously scheduled biopsy.

Stewart's Complaint places a great deal of emphasis on Cheryl missing a chemotherapy treatment due to her second incarceration at the HCADC.  However, the Court concludes that Stewart's allegations are without basis in fact.   On March 11, 2005, Dr. Patel informed Cheryl that her cancer was incurable and that the goal of chemotherapy would merely be to control the spread of her disease for as long as possible.  Furthermore, the records reflect that Cheryl missed both her Week Five and Week Six chemotherapy treatments.  Cheryl resumed her Week Five treatment the day before her arrest on a Florida Warrant.  Because she was scheduled for a two-week rest period after her Week Six treatment, Cheryl missed only one chemotherapy treatment due to her brief incarceration at the HCADC.

Based on the evidence of record, the Court is unable to conclude that Stewart has met his burden of establishing that Defendants' acts or omissions caused Cheryl's death. The medical evidence indicates that the delay in obtaining a biopsy of Cheryl's lymph node is at least partly attributable to her own neglect in timely pursuing the matter. Additionally, the available records indicate that Cheryl's chemotherapy sessions were palliative rather than curative. Stewart has failed to provide any expert medical opinions regarding the consequences of the brief delay in Cheryl's treatment. Accordingly, the Court is unable to conclude that Stewart has created a genuine issue as to the existence of a causal link between the Defendants' allegedly unconstitutional acts and Cheryl's death of cancer.

Based on the foregoing analysis, the Court finds that Stewart has failed to establish that Defendants acted with deliberate indifference to Cheryl's serious medical needs. Even if Stewart were somehow able to prove that a constitutional violation occurred, this Court finds no policy or custom on the part of Harrison County or the Harrison County Sheriff which was the moving force behind the alleged violation. Finally, Stewart has failed to establish causation between Defendants' allegedly unconstitutional acts and Cheryl's death. Therefore, there exists no basis for Stewart's wrongful death claims against the Defendants in their official capacities.

## II. Stewart's Individual Capacity Claims:

Stewart's Complaint additionally asserts claims against Defendants in their individual capacities. In response, Defendants plead the affirmative defense of qualified immunity. In assessing a claim of qualified immunity, the determination must first be made as to whether the plaintiff has alleged a violation of a clearly established constitutional right. *Siegert v. Gilly*, 500 U.S. 226, 231 (1991). If a violation of a right has been alleged, then it must be determined whether the defendant's conduct was objectively reasonable. Even if the conduct violates a constitutional right, qualified

immunity is applicable if the conduct was objectively reasonable. *Hare*, 135 F.3d at 327.

The Court finds that Stewart has failed to create a genuine issue as to whether Cheryl suffered a violation of her constitutional rights while incarcerated at the HCADC. Stewart's allegations that Defendants were deliberately indifferent to Cheryl's medical needs are completely rebutted by the numerous medical records indicating that Cheryl received prompt and thorough medical care during both her first and second periods of incarceration at the HCADC.

As the Court has previously discussed in great depth, *supra*, Cheryl was examined and evaluated by Dr. Compton on at least five occasions during the approximately fifty days in which she was first detained at the HCADC. Dr. Compton prescribed Cheryl pain medication, ordered laboratory work, and referred her to specialists. Additionally, Cheryl was examined on two occasions by Dr. Sproles, where she underwent x-rays, CT scans, and a biopsy of the mass in her neck. After Cheryl was diagnosed with cancer, Dr. Compton promptly ordered that Cheryl be seen by Dr. Pande for chemotherapy treatment. Cheryl was released from custody soon thereafter.

Following Cheryl's second arrest and incarceration at the HCADC, Dr. Compton examined Cheryl twice and promptly ordered that her medical records be forwarded over from her oncologist. Additionally, Dr. Compton requested that Florida authorities expedite Cheryl's extradition in light of her medical condition. Thereafter, Florida authorities elected not to extradite Cheryl and she was again released from custody of the HCADC.

In light of the medical attention that Cheryl received during her two incarcerations, the Court is simply unable to conclude that Defendants exhibited deliberate indifference to Cheryl's medical needs. However, even if Stewart's allegations were sufficient to create an issue as to whether Cheryl suffered a violation of her constitutional rights, the Court finds that summary judgment would still be appropriate because Stewart fails to allege any unreasonable conduct on behalf of the Defendants.

Stewart's allegations of unreasonable conduct primarily focus on the fact that Cheryl's incarcerations caused her to miss a scheduled biopsy and later interfered with her sixth chemotherapy treatment. However, the Court finds that the evidence of record refutes Stewart's claims. First, there is simply no evidence suggesting that Defendants knew or should have known that Cheryl's first incarceration caused her to miss a biopsy. The medical records before the Court do not indicate a specific date that Cheryl was scheduled for a biopsy, nor do any of the medical records or Cheryl's own medical requests mention that a biopsy of her neck had been scheduled. Absent some evidence tending to establish that Defendants were aware of the missed biopsy appointment, the fact that Cheryl missed her biopsy due to incarceration is irrelevant

Stewart's second allegation of unreasonable conduct centers around the interruption in Cheryl's chemotherapy treatment cause by her second incarceration. Stewart asserts that Defendants were aware that Cheryl was receiving chemo because she had an Infuse-A-Port chemotherapy port in her chest. However, Stewart fails to allege how the Defendants conduct was unreasonable. The record indicates that Defendants were aware that Cheryl was being treated for cancer, as Dr. Compton promptly requested that her medical records be forwarded over from her oncologist. Any delay in the receipt of those records cannot fairly be attributed to the Defendants, as Hurricane Katrina struck the Gulf Coast during that same period. While release of the medical records was pending, Cheryl was seen by Dr. Compton and given medication to ease any pain or discomfort. Furthermore, Dr. Compton requested that Cheryl's extradition be expedited due to her poor health. The Court finds that Defendants acted reasonably given the circumstances and timing.

Based on the evidence of record, the Court concludes that Defendants are entitled to qualified immunity as to Stewart's individual capacity claims. The medical records indicate that Cheryl received adequate medical treatment during her incarcerations at the HCADC. Furthermore, the Court finds that

there is no evidence of unreasonable conduct on behalf of the Defendants.   This issue is without merit

Finally, the Court also finds that to the extent Stewart's complaint could be construed to allege claims under state law, they are barred by provisions contained in the Mississippi Tort Claims Act, Miss. Code Ann. § 11-46-11, *et seq*.  Specifically, the Act provides that a government subdivision shall not be liable for a claim "of any claimant who at the time the claim arises is an inmate of any detention center, jail, workhouse, penal farm, penitentiary, or other such institution regardless of whether such claimant is or is not an inmate . . . when the claim is filed."  Miss. Code Ann. § 11-46-9(1)(m).  The inmate exemption to the MTCA applies equally to pretrial detainees as well as prisoners. *See Love v. Sunflower County Sheriff's Dept.*, 860 So.2d 797 (Miss. 2003).  The Court finds that because Cheryl was a pretrial detainee at the time these events allegedly occurred, any claims arising under Mississippi law as a result of these alleged events are barred by the above provision.

## CONCLUSION:

Based on the forgoing analysis, this Court is of the opinion that Stewart has failed to meet his burden of demonstrating any genuine issues of material fact which would preclude summary judgment on his section 1983 claim.  Therefore, this Court finds the Defendants' Motions [62-1; 64-1] for Summary Judgment and Motion [67-1] for Qualified Immunity should be granted, and that all claims against the Defendants should be dismissed with prejudice, both in their individual and official capacities.

In accordance with the Rules of this Court, any party, within ten days after being served a copy of this recommendation, may serve and file written objections to the recommendations, with a copy to the District Judge, the U.S. Magistrate Judge, and the opposing party.  The District Judge at that time may accept, reject or modify in whole or in part, the recommendation of the Magistrate Judge, or may receive further evidence or recommit the matter to this Court with instructions.  Failure to timely file

written objections to proposed findings, conclusions, and recommendations contained in this report will bar an aggrieved party, except on the grounds of plain error, from attacking on appeal unobjected to proposed factual findings and legal conclusions accepted by the District Court. *Douglass v. United States Auto Ass'n*, 79 F.3d 1425 (5th Cir. 1996).

This the    28th    day of January, 2009.

s/ John M. Roper
_____
CHIEF UNITED STATES MAGISTRATE JUDGE